CHARLES H. MERRIMAN *et al.*, Assignees of the Ballou Manufacturing Company *et als.*, *vs.* THE SOCIAL MANUFACTURING COMPANY *et als.*

B. & S., manufacturers, were the sole stockholders and officers of the B. Company, a corporation. B., the chief owner of the property used by B. & S., transferred this property to the B. Company by a deed which contained the following provision : " In further consideration for the premises hereby conveyed, the said B. Company agree and are to pay and discharge all the indebtedness now existing against said B. and B. & S., now due, or to grow due: "

*Held*, that under this provision the B. Company was liable for the outstanding notes of B. & S., and for renewals of the same, also for the outstanding accommodation indorsements of B. & S., whether due or to become due, and for the renewals of such indorsements.

*Held*, further, that the holders of these notes, original and indorsed, were either directly or by subrogation entitled to payment from the B. Company.

Certain outstanding notes with the accommodation indorsement of B. & S. were held by banks. At their maturity it appeared that other notes for the same amount, and with the same indorsements, were offered for discount and accepted; that the proceeds of the discount were placed to the credit of the makers, who thereupon drew their checks for such proceeds; and with these checks paid their former notes which were returned to them stamped " paid : "

*Held*, that this transaction made a new credit and a new loan, and that these latter notes were not renewals of the former.

*Held*, further, that these latter notes were not protected by the provision in the deed from B. to the B. Company.

BILL IN EQUITY. The facts involved and the prayer of the bill are stated in the opinion of the court.

*July* 20, 1878. DURFEE, C. J. This is a bill for instructions in a case which may be stated as follows :

Prior to October 13, 1875, George C. Ballou and his son David Ballou were, and for many years had been, extensively engaged in manufacturing under the firm of George C. Ballou & Son, the property used in the business being chiefly owned by George C. Ballou. The Ballou Manufacturing Company organized as a corporation September 30, 1875, under a charter granted in 1872. October 13, 1875, George C. Ballou conveyed all the real estate, mills, and machinery used in the manufacturing business of George C. Ballou & Son to the corporation, the consideration named in the premises of the deed being one dollar. The deed contained the following clause, to wit :

" And whereas, and in further consideration for the premises hereby conveyed, the said Ballou Manufacturing Company agree and are to pay and discharge all the indebtedness now existing against said George C. Ballou and George C. Ballou & Son, now due or to grow due."

The corporation voted, November 2, 1875, to accept the deed, subject to all its conditions, and to take it in full payment for 850 shares of the capital stock subscribed for by George C. Ballou and for 150 shares subscribed for by David Ballou, who thereupon became the sole owners of the stock. On the same day George C. Ballou was elected president and David Ballou treasurer, and both were elected directors. The deed to the corporation was recorded November 23, 1875.

April 17, 1876, the Ballou Manufacturing Company, and George C. Ballou & Son, respectively, assigned all their property to the complainants for the equal benefit of all their creditors.

At the time of the assignment the Social Manufacturing Company held the note of George C. Ballou & Son for $5,000, payable in six months, dated November 27, 1875, but being a renewal

of a note for the same amount bearing date prior to October 13, 1875.

At the time of the assignment George C. Ballou & Son were, and for many years had been, accommodation indorsers for Oren A. Ballou & Co., and as such had indorsed several notes, which did not mature until after October 13, 1875, and which, when they matured, were renewed by notes of the same description for the same or a less amount. Two of these notes, dated February 21, 1876, are held by the Social Manufacturing Company, and the others, five in number, by three different banks, the holders of the renewal having been holders of the original notes. The holders of all these several notes have presented them to the complainants, as assignees of the Ballou Manufacturing Company, as claims on which they are entitled to dividends under the assignment of the Ballou Manufacturing Company. The complainants question their right to dividends, and desire the instruction of the court.

The dividends are claimed under the clause in the deed to the Ballou Manufacturing Company, above recited, which binds the company to pay and discharge all the existing indebtedness of George C. Ballou & Son, whether due or to grow due.

No question is made in regard to the right of the holders of these notes to dividends on the ground that there is no privity between them and the Ballou Manufacturing Company; but it is assumed on both sides that they cannot be excluded on any such ground. Counsel have, however, at our request, submitted authorities, in accordance with which we find that the holders of the notes are entitled, either directly or by subrogation, to dividends under the assignment of the corporation, unless excluded on other grounds. See *Urquhart* v. *Brayton, ante,* p. 169, and cases cited; *Klapworth* v. *Dressler,* 13 N. J. Eq. 62; *Crowell* v. *Currier,* 27 N. J. Eq. 152; *Curtis* v. *Tyler,* 9 Paige, 432; *Marsh* v. *Pike,* 10 Paige, 595; *Blyer* v. *Monholland,* 2 Sandf. Ch. 478; *Vrooman* v. *Turner,* 8 Hun, 78; *Thompson* v. *Bertram,* 14 Iowa, 476; *Crawford* v. *Edwards,* 33 Mich. 354; *Miller* v. *Thompson,* 34 Mich. 10.

It is contended that the holders of these notes are not entitled to dividends because the notes are not a part of the indebtedness existing against George C. Ballou & Son on October 13, 1875,

but are an indebtedness subsequently contracted. The holders of the notes contend that, though the notes were given after October 13, 1875, they were given for debts previously contracted, and given not in payment, but simply to renew the promise and extend the time of payment.

The doctrine of this court, established by repeated decisions, is that a negotiable promissory note, given by the debtor for a preëxisting debt, does not pay the debt unless given and received as payment, the burden of proving that it was so given and received being on the party who maintains it. Under this rule we see no reason why the note first above-mentioned should not be regarded as representing a debt which existed prior to October 13, 1875; for there is not the slightest evidence that the note was either given or received as absolute payment of the debt then existing. It merely extended the time of payment, or, at the utmost, operated only as conditional payment. It does not appear that it was ever negotiated, which, in *Sweet & Carpenter* v. *James*, 2 R. I. 270, is said to make the new note *primâ facie* payment. We think, therefore, the new note never having been paid, the prior indebtedness must be held to have remained unextinguished.

It is urged that the indebtedness, if not extinguished, was at least extended, and that, for that reason, the Ballou Manufacturing Company cannot be held. The objection might have some force if the indebtedness had been extended without the consent of the corporation; but inasmuch as the copartnership and the corporation are composed of the same persons, it must be presumed that the indebtedness was extended with the consent of the corporation and for its benefit, as well as for the benefit of the copartnership.

What we have said in regard to the first-mentioned note is equally applicable to the two other notes held by the Social Manufacturing Company, unless, upon some other ground, they are not to be regarded as representing an indebtedness existing against George C. Ballou & Son prior to October 13, 1875. The note first above-mentioned was made by George C. Ballou & Son. The other two notes were not made by them. They were simply indorsed by them for the accommodation of Oren A. Ballou & Co., who were the makers. It is contended that an

indorsement, before notice of dishonor, is not an " indebtedness," but only a contingent liability ; and that it was the indebtedness existing against George C. Ballou & Son prior to October 13, 1875, not their contingent liabilities, that the Ballou Manufacturing Company agreed to pay and discharge. On this ground, therefore, the right to dividends on account of notes so indorsed is denied.

Indebtedness is a word of large meaning. It is used to denote almost every kind of pecuniary obligation originating in contract. We see no reason for limiting its significance in the case at bar, whether we regard the language of the stipulation or the extrinsic circumstances. The language is " *all* the indebtedness . . . . now due or to *grow* due." The assumption was obviously meant to be comprehensive. We think it must be held to cover liabilities contracted by indorsement, whether then due or to grow due.

But it is further urged that the liability or indebtedness never did grow due, because there was no notice to the indorsers when the notes matured. It is true there was no notice, but notice was not given because the indorsement was renewed. The indorsers thereby waived notice by promising to pay in case they were duly notified when the new notes matured, and it is conceded that they were then duly notified.

These are the only grounds suggested at the hearing for the exclusion of the three notes first mentioned. We do not think that either of them can be sustained.

We next come to consider the renewal notes held by the different banks. It appears that when these notes were given the former notes were surrendered. In *Nightingale* v. *Chafee*, 11 R. I. 609, we decided that such surrender or cancellation was not in itself proof of absolute payment, especially when payment in that manner was obviously not for the creditor's interest. We still adhere to that view. To keep the old note is to keep the evidence of the debt as it were in duplicate. This might not be desired by either party. It appears, however, in the case at bar, that the old notes when surrendered were stamped " paid " by the banks. This was certainly significant, but perhaps not decisive ; for it may be said they were paid *sub modo*, but not absolutely. *Maillard* v. *Argyle*, 6 M. & G. 40 ; *Berry* v. *Griffin*, 10 Md. 27 ; *Wheeler* v. *Schroeder*, 4 R. I. 383 ; 2 Amer. Lead. Cases,

5th ed. 267. But in the case at bar there was something beyond even this. It is admitted that the new notes were not simply exchanged for the old, but that the new notes being offered to the banks were discounted, and the proceeds placed to the credit of the makers on the books of the bank ; that thereupon, the old notes having matured, the makers drew their checks upon the banks for the amount thereof, and that it was not until after these checks were received by the banks that the old notes were stamped " paid," and surrendered. And in view of this complex operation were they not paid ? Of course the question is, What did the parties intend ? We have considered this question carefully, and the more carefully because we now learn what it may have been important for us to have known in deciding other cases, that the same practice prevails in all the banks ; and we cannot resist the conclusion that the parties intended to have the new notes represent new debts, the old being regarded as paid and extinguished. The new notes were given to create new credits, or, in other words, to procure in effect new loans, the proceeds of which were applied, by the checks drawn for that purpose, to the payment of the notes, which were surrendered. This, and nothing short of this, is the real import of the acts which were done, and of the record which was made of them. *Letcher* v. *Bank of the Commonwealth*, 1 Dana, 82, 84 ; *Slaymaker* v. *Gundacker's Executors*, 10 S. & R. 75, 82 ; *Hill* v. *Bostick*, 10 Yerg. 410 ; 2 Parsons on Notes & Bills, 203.

Our conclusion is that the paper held by these banks does not represent any part of the indebtedness existing against George C. Ballou & Son prior to October 13, 1875, but that it represents a new indebtedness subsequently contracted, and consequently that it does not entitle its holders to dividends under the assignment of the Ballou Manufacturing Company.

It is suggested that the notes may be provable, even if paid, because they may be regarded as paid by George C. Ballou & Son. We think, however, that if they can be regarded as paid by George C. Ballou & Son, rather than by Oren A. Ballou & Co., it will not make them provable specially for the benefit of the banks holding the new notes ; but only in favor of George C. Ballou & Son, or their assignees, for the copartnership creditors generally. But whether they are to be regarded as paid by George C. Ballou & Son is not a question presented by this bill.

The bill asks for instructions in regard to two other notes held by the Jackson Bank. But if the notes last above considered are not entitled under the assignment of the corporation, the other notes are still less so. We instruct the assignees accordingly.

POTTER, J., dissenting. The question submitted in this case arises under a clause in a deed made by George C. Ballou to the Ballou Manufacturing Company, dated October 13, 1875, and sent to record November 23d. By this deed George G. Ballou conveyed to the corporation a large amount of manufacturing and other property, and it was provided in it that "in further consideration for the premises hereby conveyed, said Ballou Manufacturing Company agree and are to pay and discharge all the indebtedness now existing against said George C. Ballou and George C. Ballou & Son now due or to grow due."

George C. Ballou and his son David composed the firm, and they were the sole stockholders in the new corporation, and were elected directors, and one of them president and the other treasurer of it.

And the present bill is filed to obtain the opinion of this court as to what debts or liabilities were covered by the aforesaid clause in the deed.

The claims all consist of promissory notes held by different banks and corporations, and it is to be noticed that none of them are dated before the date of the deed. With two exceptions, they are renewals, and it is agreed that they are, of previous notes held by the payees at the date of the deed. The two notes before mentioned were for discounts obtained at a different place to take up two notes which existed at the date of the deed.

Two views may be taken of the nature of the liability of the corporation.

It may be viewed merely as an agreement by the corporation to indemnify George C. Ballou & Son against being called upon to pay certain debts.

The objection to this view seems to be that if, when the debts became due, George C. Ballou & Son were insolvent, so that they paid nothing, there would be nothing to indemnify them for, and the whole consideration of the deed would fail unless the holders could go into equity and have the property applied to

pay these specific debts ; and unless it is construed to be in some way, and in some direct way, a security for a certain amount of debt, there is no consideration whatever for the deed.

And if, because George C. Ballou & Son have given new notes for the debts, it is to be treated as payment by them, and it is decided that the only remedy is for the assignees to bring in their claim against the insolvent corporation, the dividend received by the assignees of George C. Ballou & Son must be applied not only to these debts, but also to any other debts incurred by George C. Ballou & Son after the date of the deed, and thus the deed might partially, at least, fail of its intended effect.

It is not in words an agreement to indemnify nor an agreement that they will assume, leaving something more to be done to complete it, but a promise to pay and discharge.

It seems to me more reasonable to consider it as an actual assumption of the debts.  On this view, when the corporation afterwards made an assignment in trust for creditors, the effect would be to recognize these debts as debts of the corporation, and the property would become a trust fund for their payment, and a court of equity would compel the application of it.

One of the strongest arguments that has been adduced in favor of considering it as indemnity only is that there was no privity of contract so that the creditors could sue the corporation directly ; in other words, that the creditors were strangers to the contract.

But could not the right of the creditors be enforced at law ? If A. makes a promise to B. for the benefit of C., can C. enforce it against A. ?  The cases as to whether C. can sue in his own name are to some degree conflicting.  Courts should endeavor to extend and amplify the remedies for wrongs, " *ampliare jurisdictionem*," and not to narrow and contract them.  And this disposition has been manifested in many of the American cases.  One objection generally made to allowing in all cases a suit by C. is that the promisor might thus be exposed to two suits, as the promisee B. has an interest in the fulfilment of the promise, which he has a right to protect, and also, if compelled himself to pay C., might sue A. to recover the money back.

It is laid down as the tendency of the decisions, 2 Amer. Lead. Cases, 5th ed. 182, that if the third person, for whose benefit the

promise is made, will be injured by the breach, a promise will be implied in his favor if the loss would fall primarily or exclusively on him, and a judgment in *assumpsit* will cover the whole ground and be adequate to the ends of justice. Can there be any doubt in the present case that a judgment in favor of one of the banks or a voluntary payment to the bank would protect the Ballou Manufacturing Company against any suit by George C. Ballou & Son ? They would have performed the promise they made, and George C. Ballou & Son could have no ground of action whatever.

And in a case like the present the creditor or third party may be considered to have lost something, inasmuch as by the agreement the property is put farther out of his reach.

The older cases in Massachusetts were strongly in favor of the right of C. to sue in his own name.

In *Carnegie* v. *Morrison*, 2 Met. 381, which was a case of a letter of credit, Shaw, C. J., reviews the cases. In the case of money had and received C. was always allowed to sue, although there was no communication between A. and C. and no privity of contract besides what arose from the duty. In *Lilly* v. *Hays*, 5 Ad. & E. 548, it seemed to be held that a consideration moving from a stranger, if adopted by the plaintiff, was sufficient. It was so laid down broadly in *Felton* v. *Dickinson*, 10 Mass. 287 ; and in *Hall* v. *Marston*, 17 Mass. 575, it was held the third person might sue even if there had been no communication between the parties and no agreement on the part of B. to pay, except what was implied from his receiving the property ; C. might sue either A. or B. In *Arnold* v. *Lyman*, 17 Mass. 400, A., being about to fail in business, assigned property to B. to pay certain specified debts, including the plaintiff's, and B. gave a written agreement to pay them, and it was held that C. might sue if he elected to affirm the act done by the debtor in his behalf. The Chief Justice, p. 401, says the point has always been regarded as settled in Massachusetts.

In *Brewer* v. *Dyer*, 7 Cush. 337, 340, the court say that it is a " principle of law recognized and clearly established in this commonwealth that when one person, for a valuable consideration, engages with another by simple contract to do some act for the benefit of a third, the latter, who would enjoy the benefit of the

act, may maintain an action for the breach of such an engagement. *Felton* v. *Dickinson*, 10 Mass. 287 ; *Hall* v. *Marston*, 17 Mass. 575 ; *Arnold* v. *Lyman*, 17 Mass. 400 ; *Carnegie* v. *Morrison*, 2 Met. 381. In the latter case all the authorities are fully reviewed in the opinion of the court, and the rule of law clearly vindicated and established. It does not rest upon the ground of any actual or supposed relationship between the parties, as some of the earlier cases would seem to indicate ; *Dutton* v. *Poole*, 1 Vent. 318 ; 2 Walford on Parties, 1144 ; nor upon the reason that the defendant, by entering into the agreement, has impliedly made himself the agent of the plaintiff; per Coleridge, J., in *Lilly* v. *Hays*, 5 Ad. & E. 551 ; but upon the broader and more satisfactory basis that the law, operating on the act of the parties, creates the duty, establishes the privity, and implies the promise and obligation on which the action is founded."

In *Bohanan* v. *Pope*, 42 Me. 93, the court, after referring to the general rule that a stranger to the contract cannot sue in his own name, say that those cases are excepted where money is paid to one for the use of another, or where A. agrees with B., for a valuable consideration, to do something for C., and this, they say, is well established in Maine and Massachusetts. The two remedies are not concurrent, but elective, and the election to sue B. implies an abandonment of the claim against A. In this case C. had sued A., the party primarily liable, and obtained judgment, but the execution was only satisfied in part. He then sued B. It was argued, and the court seem to take this view, that after C. obtained judgment against A., A. and B. had a right to settle with each other on the ground that they were relieved from the contract they had made for C.'s benefit.

In *Exchange Bank of St. Louis* v. *Rice*, 107 Mass. 37, 41, the Supreme Judicial Court of Massachusetts speak of parts of these opinions as the " unguarded expressions of Chief Justice Shaw and Mr. Justice Bigelow," &c., &c. Those opinions were the opinions of the Supreme Judicial Court, or they were not. If not, then they were imposed upon the profession by those gentlemen, one chief justice and the other afterwards chief justice, for what they were not. If they were the opinions of the court, then, if the successors of these gentlemen have seen fit to overrule them, it may be binding upon the profession in Massachu-

setts, but the courts of other states are at liberty to attach to them the weight of authority due to the several courts as composed at the several times the decisions were made.

In *Mellen, Administratrix*, v. *Whipple*, 1 Gray, 317, the defendant had bought the equity of redemption of an estate subject to a mortgage, and had agreed in the deed to assume and cancel the note and mortgage. The plaintiff's intestate by assignments became owner of the mortgage debt, and sued the defendant on that agreement. Mr. Bishop, the defendant's counsel, contended : 1. That this was a chose in action on which Mellen could not sue ; and, 3. That there was in this case no fund in the hands of the defendant on which the plaintiff had any equitable claim. The plaintiff had no claim excepting by his mortgage. The court, by Metcalf, J., say that, according to several cases, the agreement was one on which the plaintiff's assignor might have sued. Could the plaintiff himself sue ? They then go on to classify the Massachusetts cases in which it has been held that a third person might sue : 1. *Assumpsit* for money had and received, which has been maintained where there was no actual privity in contract, in cases where money or property had been put into the defendant's hands and a promise was implied from the acceptance of it. *Arnold* v. *Lyman*, 17 Mass. 400 ; *Hall* v. *Marston*, 17 Mass. 575 ; *Carnegie* v. *Morrison*, 2 Met. 381. 2. Cases where promise was made to a father, &c., for the benefit of a child. *Felton* v. *Dickinson*, 10 Mass. 287 ; but see comments on *Dutton* v. *Poole*, 1 Vent. 318, in *Hall* v. *Huntoon*, 17 Vt. 244, 251. 3. A class under which *Brewer* v. *Dyer*, 7 Cush. 337, would fall. They go on to say that the defendant in the case before them had no money in conscience belonging to the plaintiff. No funds have been put into the defendant's hands to meet the claim. There was no family relationship, and there had been no use of land under a promise or liability to pay rent for it. Here the stipulation in the deed was nothing more than the law would have required if the defendant wished to hold the land.

Mr. Bishop, who was the attorney in this case, in his excellent little work, First Book of the Law, § 467, claims the credit of having suggested and urged on the court the distinction on which the decision was made : that there was in this case no property

held by the defendant as a trust or fund on which the plaintiff had an equitable claim. The previous Massachusetts decisions[1] had gone on the broad ground of the right of C. to sue on a promise made to B., and as he understood the law as laid down in those decisions, he had no case unless he could induce the court to draw some distinction which would take it out of the former decisions. And he had to go out of Massachusetts to find cases in his favor. But the court adopted his view.

And see, upon this point of assuming payment of a mortgage, *King* v. *Whitely*, 10 Paige, 465 ; *Crowell* v. *Currier*, 27 N. J. Eq. 152; *Vrooman* v. *Turner*, 8 Hun, 78 ; *Burr* v. *Beers*, 24 N. Y. 178; *Garnsey* v. *Rogers*, 47 N. Y. 233 ; *Twichell* v. *Mears*, 6 Reporter, 40.

In *Dow* v. *Clark et als.* 7 Gray, 198, the greater part of the stock of a corporation was transferred, and the defendants, the purchasers, agreed by writing, but not under seal, to pay all the debts of the corporation, without specifying names or sums, provided the whole should not exceed $420,000. The plaintiff, who held bonds, &c., sued the defendants, and the suit was not sustained. The court, while adhering to the decision in *Mellen, Administratrix* v. *Whipple*, 1 Gray, 317, and saying that they were not disposed to go farther, distinguish this case from *Arnold* v. *Lyman*, 17 Mass. 400, where the promisor had engaged to pay certain specified debts. In this case every creditor might maintain a separate suit, and the validity of every debt might be disputed. And there was another very important point, which

---

[1] NOTE BY MR. JUSTICE POTTER. — That up to the time of *Mellen, Adm'x,* v. *Whipple*, 1 Gray, 317, it was understood to be the law in Massachusetts as Mr. Bishop says it was, that if A. made a promise to B. for benefit of C., C. had a right to sue on it, we have only to look to the history of Judge Metcalf's work on Contracts. It may not be generally known that this work was written in numbers and first so published in the American Jurist. The American Jurist for October, 1839, page 17, contains the portion of the work relating to this question. "It is now well settled, as a general rule, that in cases of simple contracts, if one person makes a promise to another for the benefit of a third, the third may maintain an action upon it, though the consideration does not move from him," and he goes on to cite cases. When the numbers were published in a volume the article on this subject was almost entirely rewritten to conform to the then notions of the Supreme Judicial Court of Massachusetts, Judge Metcalf himself having delivered one of the opinions.

the court do not allude to : that before it could be settled how much any creditor could be entitled to, the whole amount of debt must be ascertained, and that could only be done in some proceeding where all the creditors could be made parties, or by waiting for length of time, &c.   It was, indeed, stated that the debts did not exceed the amount, and yet the same court, in *Furnas* v. *Durgin*, 119 Mass. 500, where a man took a deed subject to a mortgage, " which the grantee hereby assumes and agrees to pay," &c., held that it was not an agreement to indemnify, but a contract to pay the debt, if it was the debt of the grantor.

In Pennsylvania the same doctrine is held.   See *Torrens* v. *Campbell*, 74 Pa. St. 470.   Recognizing, as the court in Maine did, that generally the promisee must sue, the cases are excepted where property is put in the hands of the promisor, citing a number of Pennsylvania cases.

In New Jersey many cases hold that where A. makes a promise to B. for the benefit of C., C. may sue.   *Price* v. *Trusdell*, 28 N. J. Eq. 200 ; and see *Moore* v. *House*, 64 Ill. 162.

And Perkins in his note to Chitty on Contracts, vol. 1, p. 76, says that this is the general tendency of American decisions, and in Kent's Commentaries, 12th ed. vol. 2, *464, note *e*, it is said that this is now understood to be the settled doctrine.

1 Chitty on Pleading, *4, *5.   If not under seal, the general principle is that the party for whose sole benefit it is made may sue in his own name, although the engagement be not directly to or with him.   If A. gives goods to B., B. to pay C., and he does not, C. may sue and declare, &c.   " An express privity of contract between A. and C. seems to be created by the stipulations of the parties in cases of this nature."

And so Chief Justice Shaw, in *Carnegie* v. *Morrison*, 2 Met. 381, 396 : " The law operating upon the act of the parties creates the duty, establishes the privity, and implies the promise and obligation upon which the action is founded."

And so far as privity of contract is concerned, the courts have, in many classes of cases, not only for money had and received, but in other cases, *e. g.* for torts or breach of duty, implied contracts where it was the merest fiction of law.   Dicey on Parties, *91, *94.

To call a party for whose express, and it may be sole, benefit

a contract is made a stranger to that contract seems to be carrying legal logic into absurdity.

The objection is sometimes made that the party promising may be exposed to two suits. But in two cases it was held that an election by the third party to charge the promisor would discharge the party originally bound. *Commercial Bank* v. *Woods*, 7 W. & S. 89; *Warren* v. *Batchelder*, 16 N. H. 580, cited in 2 Amer. Lead. Cases, 183; and see 1 Smith's Lead. Cases, 282, and *Blymire* v. *Boistle*, 6 Watts, 182. And it has been held that the third party ratifies the contract by making demand and bringing his suit, and that this would be held to be an election to discharge the original debtor. 2 Amer. Lead. Cases, 208, 209; *Sanderson* v. *Lamberton*, 6 Binney, 129; and see *Bohanan* v. *Pope*, 42 Me. 93.

In case of a check or an assignment of part of a fund the objection is that the debt cannot be split up and the debtor rendered liable to several suits without his own consent.

If B. still retained the power to withdraw the funds from the hands of A., that would be a serious objection; but it certainly could not be held that he would have a right to revoke or withdraw after engagements had been made on the faith of it, or after C. had adopted it or sued on it. See Story Eq. Jur. § 1045.

The doctrine held by the majority of the court, that when C. accepts the promise made for his benefit it will be good as a novation, applies only to that class of cases where there is a debt already due, but does not apply where the undertaking is for an entirely new consideration.

In many cases where this question has arisen the decision has turned on the point that the property was not put in the hands of the promisor to pay any specified or ascertained debts, as *e. g.* assignments for benefit of creditors generally. But in this case George C. Ballou & Son must be presumed to know their indebtedness, and if they did, then the corporation knew what they were assuming, for they were its officers.

The cases where it has been held that the person for whose benefit an insurance is made may sue in his own name are also in point. *Davis* v. *Calloway*, 30 Ind. 112; *Rogers et al.* v. *Gosnell*, 58 Mo. 589. These cases are to the point of the right of the third party to sue in his own name, and they are important as

illustrating the doctrine of privity of contract, which was suggested on the hearing. They go far to show that a person who has an interest in the performance of a contract cannot, even at law, be called a stranger to it; and this is the tendency of the decisions. But there is no reason whatever why in parol contracts C., the third person in interest, should not sue in the name of B., the promisee. In cases of contracts under seal the beneficiary must sue in the name of the promisee; and where the promisee could himself have sued, as here, a court of equity will compel him to sue at law for the benefit of the real party in interest. Metcalf on Contracts, 206; Cary, 20, citing Stat. 2 Edw. IV. cap. 2. And in such cases courts of law will protect the rights of the real party against the acts of the nominal party. Dicey on Parties, *69, *71; Pomeroy on Remedies, § 124; *Legh* v. *Legh*, 1 B. & P. 447; and note and cases in 2 Evans's Pothier, Appendix No. 4.

This form of action may be used in both classes of contracts, and it was formerly more common in this State than now. The practice was to sue in the name of the legal owner as trustee to or for the benefit of the real party in interest. And it was considered that the person equitably entitled had a right to use the name of the legal owner or holder on indemnifying him against costs. See *Moore* v. *House*, 64 Ill. 162.

But however this may be, the right to sue in equity cannot well be disputed.

Another point made by some of the counsel is that the banks or holders of the notes which existed when the deed was executed have been paid by the new notes, and, therefore, have no claim against the corporation. But as the funds were placed in the hands of the new corporation to pay all the debts of George C. Ballou & Son, it seems more reasonable to hold that the intention was to secure the debt itself and not merely the promissory note or piece of paper, which happened to exist at the time, as evidence of the debt, and that the deed should be treated as an agreement to assume the debts themselves, the particular amount of indebtedness then existing. In this light it would make no odds whether held by the same persons who held at the date of the deed or by others.

It is argued by some of the counsel that even if the renewal

is not considered a payment, the holders have lost their claims against the corporation by giving time to the debtors, *i. e.* extending the time of payment by renewal.

To this it seems to me that there are several answers. Even if the corporation stood in the place of a surety, an extension of time does not operate as a release when the payee does not know of the suretyship. In the present case the record of the deed was constructive notice of the change of property, but it was not constructive notice of an agreement contained in it to pay certain debts. And there is no proof put in that any of the holders had actual notice of it.

But the corporation here does not stand in the place of a surety, nor does it have any of the ordinary rights of a surety. Nor if the corporation is obliged to pay the notes has it any remedy over against any other party who stood in the relation of principal to it. It is positively bound to pay the debts, and presumably out of the funds put in its possession, and the extension was really with its consent or knowledge.

Nor does the corporation lose anything by the extension. The effect of the interest being paid in advance might be a gain to them. And they lose no right of suing any other party for refunding, repayment, or contribution. If they had notice of the non-payment of any note at maturity they would have been in no better situation. The funds have been placed in their hands to pay out.

If the corporation under this agreement had paid a debt due from George C. Ballou or George C. Ballou & Son, they would not be entitled to any subrogation. But it might be otherwise if they paid any debt for which George C. Ballou or George C. Ballou & Son were only liable as indorsers.

In most of the cases before us the new notes were given by the same parties to the same persons who held the former notes and for the same amount; in one case only for a less amount. And without meaning to go beyond the present case in laying down any rule as to what should be considered as payment, but looking only to the language and object of the agreement now before us, I cannot consider them as payments or new debts substituted for the old ones, but rather as a continuation or extension of the old debt, and thus within the meaning of the agreement.

In the case of giving a note for the purchase of property, the presumption may be strong that the parties intend it as payment; but where one note is given in renewal of another the presumption is much weaker.

And the same remark applies to any practice of stamping which might be adopted for the purpose of preventing a subsequent fraudulent use of a renewed note, and to the practice said to prevail, if it does, of depositing the amount of every renewal to the credit of the borrower and letting him draw for it by check.

All of the notes were held by corporations and all were held by banks. And it is a fact well known in the history of banking in this State that accommodation loans, loans designed to be more or less permanent, constituted a considerable portion of the debts due to the old state banks. They were often renewed, because as the banks were required to make periodical reports to the state authority, they did not wish to report a large amount of dead or overdue paper; and also for a reason perhaps still more potent while the usury laws were in force, that they were thus enabled to get more interest, and also by making them payable at another place to get the exchange which the old law allowed on every renewal.

This practice of taking exchange had existed for many years, and was finally legalized and regulated by the Bank Act of June 25, 1836, § 10 ; see also Act of January 21, 1837, § 2.

But in all such cases it was really accommodation paper, a renewal of the old loan, and generally considered as a mere continuation of the old debt with the same makers and indorsers.

Of one of the notes before mentioned George C. Ballou & Son were makers, but all the other claims consist of notes of Oren A. Ballou & Co. on which George C. Ballou & Son appear only as indorsers. With the two exceptions named they are all renewals of previous notes of the same makers and indorsers and to the same holders.

On the best consideration I can give, I cannot but decide that this class of paper comes within the spirit of the agreement. It was a liability and a large liability of George C. Ballou & Son. It is not indeed stated that Oren A. Ballou & Co. were insolvent, but although the notes are long overdue they have not paid, nor is it claimed that the makers are able to pay them.

In fact, from the manner in which the case is put to us we have a right to infer that the names of George C. Ballou & Son constitute the main strength of the paper, and that they were accommodation indorsers.

Two of the notes in controversy, instead of being renewed to the former holders, were for new discounts obtained by the same makers and indorsers and for the same amounts, but from another party. But the avails were used to take up notes by the same parties and with the same indorsers, due to two other creditors who held notes covered by the deed. And it is alleged, and in fact is sufficiently apparent from the nature of the transactions, that George C. Ballou & Son were guarantors or accommodation indorsers for the makers.

Now the new lender does not stand in any relation to bring him within the ordinary rules of subrogation. It is not a case of purchase of a debt by a stranger, nor is it a case of a payment of a debt by a stranger with the consent or at the request of the debtor, nor is there anything to show that the bank making the new loan knew where the money was to be applied, and we must infer from the nature of the transaction that the makers received and applied the money. And in an ordinary case there would be a strong presumption that it was intended as payment.

But the question before us is whether, in the circumstances of this particular case, the notes are protected by the agreement we are called upon to construe.

These debts at the time of the deed constituted a part of the liabilities of the firm. Whether they originally grew out of partnership business or not is not material. It is not disputed that the indorsement of the firm was rightfully given. The large manufacturing and other property of the firm is transferred to the new corporation on an express agreement to pay a certain amount of indebtedness. If the firm knew the amount of indebtedness they were providing for, which it is presumed they did, then the corporation knew it, for every stockholder and every director and officer in the corporation knew it, and they also knew of the change made in it.

So far as affecting the corporation with notice of the amount of the debts and with notice of the manner of renewal, the fact that George C. Ballou and his son constituted the whole corpo-

ration is important.  But in other respects the corporation is a distinct legal entity, and it agrees to pay a certain amount for the property, and the consideration is the assumption and payment of this indebtedness.  And unless these debts are paid the corporation obtains the property for $6,000 less than it had agreed to pay for it.

It is contended, as an argument for holding that the agreement is to be construed merely as one of indemnity and not as a positive agreement to assume and pay the debts, that the deed does not profess to convey all the property of the grantors, and that the grantors own all the stock in the corporation, the only difference being that the real is converted into personal estate.

But this difference is a very important one to creditors.  A creditor could attach and sell a portion of the real estate; but when it is converted into stock, the sale of a portion of the stock to the creditor might only make him a minority member of the corporation, with no control whatever over its affairs, and suit against the corporation could only be brought after the notes had been taken up by the parties who were to be indemnified.

But the important point is that the payment of these debts, the amount of which we must consider that both parties knew, constituted the whole real consideration of the deed.  The only other consideration mentioned is the merely nominal one of one dollar.  And the agreement, as plain as language can make it, is not to indemnify but to pay and discharge.

It seems to me, therefore, that according to the spirit and intention of the agreement all the notes in controversy are protected by it.

*Decree entered July 27, 1878, directing the complainants, assignees, to pay pro rata dividends from the assets in their hands on the three notes held by the Social Manufacturing Company, and to pay no dividends whatever on the other seven notes in question, being those held by the different respondent banks.  No costs allowed either party, complainants or respondents.*

Charles Hart and E. C. & S. Ames, for complainants.

Edwin Metcalf & George Metcalf, Jr., for respondents.